# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

PETER KLEFTOGIANNIS,
    *Plaintiff*,

v.

INLINE PLASTICS CORP.,
    *Defendant*.

No. 3:18-cv-1975 (VAB)

## RULING AND ORDER ON MOTION TO DISMISS AND
## MOTION TO SEAL/REDACT NON-PARTY NAMES IN COMPLAINT

On December 5, 2018, Peter Kleftogiannis sued his former employer, Inline Plastics

Corporation ("Inline" or "Defendant"), alleging four causes of action arising from his

termination: (1) unlawful discrimination based on age in violation of the Age Discrimination in

Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"); (2) unlawful discrimination based on

age in violation of the Connecticut Fair Employment Practices Act, CONN. GEN. STAT. § 46a-60

(the "CFEPA"); (3) defamation, in violation of Connecticut law; and (4) negligent infliction of

emotional distress, in violation of Connecticut law. Complaint, dated Dec. 5, 2018 ("Compl."),

ECF No. 1, ¶¶ 24–35.

On February 4, 2019, Inline moved to dismiss Counts Three and Four of the Complaint,

alleging defamation and negligent infliction of emotional distress, for failure to state claim.

Motion to Dismiss, dated Feb. 4, 2019 ("Def.'s Mot."), ECF No. 12; Memorandum of Law in

Support of Def.'s Mot., dated Feb. 4, 2019 ("Def.'s Mem."), annexed to Def.'s Mot.

That same day, Inline moved to seal or redact the names of twenty-five non-management

employees specifically listed in the Complaint in this employment discrimination action. Motion

to Seal Non-Party Names in Plaintiff's Complaint, dated Feb. 4, 2019 ("Redaction Mot."), ECF

No. 11; Memorandum of Law in Support of Redaction Mot., dated Feb. 4, 2019 ("Def.'s

Redaction Mem."), ECF No. 11-1, at 2–6.

On February 9, 2019, Mr. Kleftogiannis opposed Inline's motion to dismiss. Objection to

Motion to Dismiss, dated Feb. 9, 2019 ("Pl.'s Opp."), ECF No. 17; Memorandum of Law in

Support of Pl.'s Opp., dated Feb. 9, 2019 ("Pl.'s Mem."), annexed to Pl.'s Opp., ECF No. 17-1.

On February 10, 2019, Mr. Kleftogiannis opposed Inline's motion to seal or redact the

non-party names in the Complaint. Objection to Redaction Mot., dated Feb. 10, 2019

("Redaction Opp."), ECF No. 18; Memorandum of Law in Support of Redaction Opp., dated

Feb. 10, 2019, ECF No. 18-1 ("Pl.'s Redaction Mem.").

Because both of these motions concern the Complaint and are fully briefed, the Court

considers them together in this opinion.[1]

For the reasons explained below, Inline's motion to dismiss is **GRANTED IN PART

AND DENIED IN PART**. The motion to dismiss is denied with respect to Plaintiff's claim of

defamation (Count Three), but granted with respect to Plaintiff's claim of negligent infliction of

emotional distress (Count Four).

Inline's motion to redact non-party names in the Complaint is **GRANTED.**

---

[1] Because Inline has only moved to dismiss only a portion of Mr. Kleftogiannis's claims, the Court exercises its discretion to rule on that motion without oral argument. D. Conn. L. Civ. R. 7(a)(3) ("[T]he Court may, in its discretion, rule on any motion without oral argument."); *see generally Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (recognizing a district court's inherent authority to manage its docket "with a view toward the efficient and expedient resolution of cases.") (citations omitted). The Court held a telephonic scheduling conference on February 6, 2019, at which the motion to seal/redact was briefly discussed; the Court also exercises its discretion to rule on that non-dispositive motion without oral argument. *See id.*

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations[2]

Mr. Kleftogiannis, a fifty-year-old man, is a former employee of Inline, a corporation based in Shelton, Connecticut. Compl. ¶¶ 1–2. Inline allegedly manufactures plastic food containers, and has more than 250 employees. *Id.* ¶¶ 8, 2.

Inline allegedly hired Mr. Kleftogiannis as a warehouse operator in Shelton, Connecticut on March 4, 1991. *Id.* ¶ 7.

Over several years, Mr. Kleftogiannis allegedly worked in several positions for Inline, culminating in a final position as Manufacturing Shift Supervisor, a salaried position in which he allegedly supervised 45 to 50 employees. *See id.* ¶ 7. Mr. Kleftogiannis alleges that he consistently received raises and above average performance reviews. *Id.* ¶ 10.

At some point before June 2017, Mr. Kleftogiannis allegedly complained about "being targeted for poor treatment because of his age" to Plant Manager, Vanessa Siveyer. Compl. ¶ 11.

In June 2017, Inline allegedly demoted Mr. Kleftogiannis "from the position of Production Control Manager after he expressed displeasure with the position." Compl. ¶ 12. Mr. Kleftogiannis alleges that he was "not put through any disciplinary procedure," and that the reasons "given for the demotion were minor and pretextual." *Id.* Instead, he alleges that the "actual reason for the demotion was discriminat[ion] on the basis of his age." *Id.*

The following month, Mr. Kleftogiannis alleges that he learned from multiple co-workers that Inline had created a "dinosaur list" of employees that management "felt were too old to work in the new company culture," and that management "targeted those individuals because of their age for termination." *Id.* ¶¶ 13–14.

---

[2] All factual allegations are drawn from the Complaint.

3

Two months later, in September 2017, Mr. Kleftogiannis alleges that two employees he had disciplined complained about him to Plant Manager Siveyer. *Id.* ¶ 15. Ms. Siveyer allegedly spoke with them for "a grand total of 5 minutes" before requesting an investigation of Mr. Kleftogiannis. *Id.*

On September 8, 2017, Inline allegedly suspended Mr. Kleftogiannis pending that investigation. *Id.* ¶ 16. Mr. Kleftogiannis alleges that Inline's Human Resources Manager, Danielle Chateaune, conducted a "sham investigation" in "an effort to cover up planned discrimination against the Plaintiff on the basis of his age." *Id.* ¶ 17.

In 2017, from September 8 to September 13, Ms. Chateaune allegedly interviewed at least fifteen employees "in an effort to support a decision to terminate" him on the basis of his age. *Id.* ¶¶ 20, 18. She allegedly did this, even though she was aware that "certain of the employees had an axe to grind" with him "because he had disciplined them in the past." *Id.* ¶ 18. Based on the interviews, Ms. Chateaune allegedly compiled a 17-page report "that included multiple false defamatory statements" about Mr. Kleftogiannis "including but not limited to him being unprofessional, swearing, having an affair or multiple affairs, failing to buy pizza for employees, failing to buy birthday cake for employees, not caring about his job, picking on people, being disrespectful, failing to do his job properly, intimidating employees, [and] having a bad attitude." *Id.* ¶ 20.

She allegedly wrote this report, despite the fact that her investigation "did not provide just cause for terminating [him] and in fact disclosed just minor complaints that were mainly based on rumors" about his personal life, *id.* ¶ 20, "to provide pretextual reasons to terminate" him, *id.* ¶ 21. Mr. Kleftogiannis also alleges that all employee names in the report were redacted "to aid in providing a pretextual report to terminate the Plaintiff on the basis of his age." *Id.* ¶ 22.

On September 18, 2017, Plant Manager Siveyer and Steven Welford allegedly called Mr. Kleftogiannis and terminated his employment. *Id.* ¶ 23. During that call, Mr. Welford allegedly stated that Mr. Kleftogiannis was "not the right fit" for the job. *Id.* Mr. Kleftogiannis alleges that all the reasons given for his termination "were pretextual and defamatory and provided to cover up discriminatory motives." *Id.*

## B. Procedural History

On December 5, 2018, Mr. Kleftogiannis sued Inline, alleging that (1) Inline discriminated against him on the basis of age, in violation of the ADEA and the CFEPA, *id.* ¶¶ 24–25 (Counts One and Two); (2) Inline defamed him through the publication of reasons for his employment, as stated in the internal report, to his co-workers and outside third parties who inquired about why he was no longer employed with Inline, in violation of Connecticut law, *id.* ¶¶ 26–29 (Count Three); and (3) Inline negligently inflicted severe emotional distress on him through their discrimination, defamation, and wrongful termination of his employment, *id.* ¶¶ 30–35. Mr. Kleftogiannis alleges that his "career path has been forever altered negatively and he has lost opportunities for employment[,] and he has suffered emotional distress" due to Inline's conduct. *Id.* ¶ 36.

On February 4, 2019, Inline moved to dismiss Mr. Kleftogiannis's defamation and negligent infliction of emotional distress claims under Federal Rule of Civil Procedure 12(b)(6), Def.'s Mot, arguing that: (1) Mr. Kleftogiannis failed to state a claim for defamation because the statements contained in Ms. Chateaune's post-investigation report were protected by the intra-corporate communications privilege, the allegation that the report was published to third parties is unsubstantiated, and the allegations of damages are mere threadbare recitals, *id.* at 3–4; and (2) Mr. Kleftogiannis failed to state a claim for negligent infliction of emotional distress claim

because any alleged distress was not a result of conduct by Inline during the termination process itself, *id.* at 5–6.

That same day, Inline moved to seal or redact the names of twenty-five non-management employees specifically listed in the Complaint in this employment discrimination action. Redaction Mot.; Def.'s Redaction Mem.

On February 9, 2019, Mr. Kleftogiannis objected to Inline's motion to dismiss his defamation claim, arguing that his "allegation of damages [was] sufficient" and that the investigation report had been shared with "co-workers and outside third parties," constituting defamation. Pl.'s Mem. at 4–5. Mr. Kleftogiannis also argued that the termination process began with his demotion in June 2017 and continued through Inline's "sham investigation" and his termination. *Id.* at 7. Given this extended termination process, Mr. Kleftogiannis argues that Inline "should have realized that its conduct created an unreasonable risk of causing emotional distress and . . . illness or bodily harm." *Id.* at 6.

That same day, Mr. Kleftogiannis also objected to Inline's motion to seal or redact non-party names from the Complaint.

On February 25, 2019, Inline replied to Mr. Kleftogiannis's oppositions to both motions. Reply to Pl.'s Opp., dated Feb. 25, 2019 ("Dismissal Reply"), ECF No. 20; Reply to Redaction Opp., dated Feb. 25, 2019 ("Redaction Reply"), ECF No. 18.

## II.    STANDARD OF REVIEW

### A.  Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). Any claim that fails "to state a claim upon

which relief can be granted" will be dismissed under Federal Rule of Civil Procedure 12(b)(6). FED. R. CIV. P. 12(b)(6).

In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Rule 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the

complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### B. Motion to Seal or Redact

As the Second Circuit has repeatedly held, "the common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *United States v. Amodeo* (*Amodeo I*), 44 F.3d 141, 145 (2d Cir. 1995) ("The common law right of public access to judicial documents is said to predate the Constitution.").

"Before any such common law right can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents.' " *Lugosch*, 435 F.3d at 119. Once that determination is made, the court must determine the weight of that presumption. *Id.* The weight given to that presumption of access "must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *United States v. Amodeo* (*Amodeo II*), 71 F.3d 1044, 1049 (2d Cir. 1995). "Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id.*

"Once the weight of the presumption is determined, a court must balance competing considerations against it." *Id.* at 1050. "Such countervailing factors include but are not limited to

'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.' " *Lugosch*, 435 F.3d at 120 (citing *Amodeo II*, 71 F.3d at 1050).

## III. DISCUSSION

### A. Defamation

"Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation." *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (citing *Mercer v. Cosley*, 110 Conn. App. 283, 297 (2008)). "A defamatory statement is defined as a communication that tends to 'harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her.]" *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004); *accord Hopkins v. O'Connor*, 282 Conn. 821, 838 (2007) (same).

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky*, 267 Conn. at 217 (citing *QSP, Inc. v. Aetna Cas. & Surety Co.*, 256 Conn. 343, 356 (2001); Restatement (Second) of Torts § 559 (Am. Law Inst. 1977)).

"A defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 628 (Conn. 2009). Once a defendant claims that privilege, courts must determine (1) whether or not the privilege applies, which is a question of law, *id.* at 628 (citing *Miron v. Univ. of New Haven Police Dep't* , 284 Conn. 35, 43 (2007); and (2) if so,

whether it has been abused, which is a question of fact, *id.* at 628 (citing *Bleich v. Ortiz*, 196 Conn. 498, 501 (1985)).

Inline argues that Mr. Kleftogiannis fails to state a claim because the statements made by employees as part of the internal investigation, and included in the report of that investigation, were protected by the intra-corporate communications privilege.

The Court disagrees.

As a matter of law, the intra-corporate communications privilege applies to the report produced from the internal investigation. *See Torosyan v. Boehringer Ingelheim Pharms., Inc.*, 234 Conn. 1, 29 ("[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business."); *see also Malik v. Carrier Corp.*, 202 F.3d 97, 108 (2d Cir. 2000) ("Connecticut affords a qualified privilege to intracorporate communications.") (citing *Torosyan*, 234 Conn. at 29).

But this privilege does not apply if it has been abused—i.e., if the alleged defamatory statements were published with actual malice or malice in fact. *See id.* ("In this case, however, the trial court implicitly found that, as a matter of fact, the privilege had been abused because the defendant's agents had made the statement about the plaintiff with actual malice—that is, with knowledge of its falsity or reckless disregard as to its truth."); *see also Gambardella*, 291 Conn. at 634 ("To the extent that further clarification is needed as to the meaning of these terms, we define actual malice as the publication of a false statement with knowledge of its falsity or reckless disregard for its truth, and malice in fact as the publication of a false statement with bad faith or improper motive. Therefore, it is clear that the settled law in Connecticut is that a

showing of either actual malice or malice in fact will defeat a defense of qualified privilege in the context of employment decisions.").

Inline asserts that Mr. Kleftogiannis has not pleaded facts sufficient to show that privilege was abused because he "has made no allegation that publication of the contents of the investigation were made to persons who were not privileged to see it," and because "the alleged publication to 'third parties' is wholly unsubstantiated." Def.'s Mem. at 3–4.

The Court disagrees.

First, Mr. Kleftogiannis has sufficiently alleged that the statements were published, by circulating the report among the managers. *See Torosyan*, 234 Conn. at 27–28 ("Although intracorporate communications once were considered by many courts not to constitute 'publication' of a defamatory statement, that view has been almost entirely abandoned, and we reject it here.") (citations omitted).

Mr. Kleftogiannis also alleges that the statements were published to co-workers who inquired about why he was terminated. Taken as true, that allegation would indicate that it was published outside of the privilege because it allegedly was published to non-managers.

Second, Mr. Kleftogiannis has alleged that the privilege was abused because he alleges that the statements were collected from employees that Inline knew had personal vendettas against him. In other words, Inline allegedly had reason to know that the statements those employees gave were untrue, but that they nevertheless collected and published them to others. Taken as true, that allegation could plausibly suggest that the privilege was abused. Thus, it would not matter whether the statements were published beyond the ambit of the managers because no privilege would apply.

At the motion to dismiss stage, such allegations are sufficiently detailed to survive a motion to dismiss. In other words, they contain sufficient "factual amplification" to render Mr. Kleftogiannis's claim "plausible" at the pleading stage. *See Arista Records*, 604 F.3d at 120 (citation omitted); *see Palin v. N.Y. Times Co.*, No. 17-3801-cv, 2019 WL 3558545, at *9 (2d Cir. Aug. 6, 2019) ("Palin's evidentiary burden at trial—to show by clear and convincing evidence that Bennet acted with actual malice—is high. At the pleading stage, however, Palin's only obstacle is the plausibility standard of *Twombly* and *Iqbal*. She has cleared that hurdle.").

In any event, courts within this District typically resolve questions of whether a qualified privilege was abused, in the context of a defamation claim, at the summary judgment stage, on a fuller factual record. *See, e.g.*, *Julian v. Securitas Sec. Servs. USA, Inc.*, No. 3:08-cv-1715 (MRK), 2010 WL 1553778, at *5 (D. Conn. Apr. 19, 2010) ("Therefore, based on the qualified privilege for corporate communications, the Court grants Dominion's motion for summary judgment on Mr. Julian's defamation claim."); *Oski v. Fed. Express Corp.*, No. 3:07-cv-1082 (WWE), 2009 WL 3257777, at *6 (D. Conn. Oct. 7, 2009) ("Without evidence indicating that defendants purposefully avoided the truth, plaintiff cannot overcome the intracorporate communication privilege. The Court will grant summary judgment in defendants' favor on this claim."); *Hanna v. Infotech Contract Servs.*, No. 3:01-cv-680 (SRU), 2003 WL 2002773, at *10 (D. Conn. Apr. 21, 2003) ("As discussed above, Hanna has provided no evidence either that he was terminated for any reason other than for sexually harassing Pfizer employees or that he was in fact terminated on account of his race, ethnicity, or sex, or for invoking dispute resolution mechanisms. Therefore, there is no evidence from which a reasonable jury could conclude that the allegedly defamatory statements were not privileged, and summary judgment on count five is appropriate.").

That approach is appropriate here. At the summary judgment stage, Inline will bear the initial burden of proof in showing that the intra-corporate communications privilege applies. If they are able to do so, Mr. Kleftogiannis will bear the burden of defeating that privilege by showing it was abused. *See Dickinson v. Merrill Lynch, Pierce, Fenner, & Smith Inc.*, 431 F. Supp. 2d 247, 262–63 (D. Conn. 2006) ("The plaintiff bears the burden, at the summary judgment stage, of pointing to evidence that could rebut the presumption of good faith by showing a genuine issue of fact as to whether the statement was made with 'malice in fact.'") (citations omitted); *see also, e.g.*, *Julian*, 2010 WL 1553778, at *5 ("Nor has Mr. Julian shown that Dominion abused the privilege.").

### B. Negligent Infliction of Emotional Distress

To state a claim of negligent infliction of distress, a plaintiff must plead that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Hall v. Bergman*, 296 Conn. 169, 182 n.8 (2010) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003)); *accord Tyus v. Newton*, No. 3:13-cv-1486 (SRU), 2015 WL 1471643, at *13 (D. Conn. Mar. 31, 2015) (quoting *Carrol*, 262 Conn. at 444).

In the employment context, the Connecticut Supreme Court has narrowly defined the range of conduct that can create an unreasonable risk of causing the plaintiff emotional distress:

> We first consider the normal expectations of individuals in the context of an ongoing employment relationship. It is clear that such individuals reasonably should expect to be subject to routine employment-related conduct, including performance evaluations, both formal and informal; decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; and

disciplinary or investigatory action arising from actual or alleged employee misconduct. In addition, such individuals reasonably should expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like.

Thus, it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace. There are few things more central to a person's life than a job, and the mere fact of being demoted or denied advancement may be extremely distressing. That is simply an unavoidable part of being employed. We recognize, however, that that does not mean that persons in the workplace should expect to be subject to conduct that transgress[es] the bounds of socially tolerable behavior; and that involves an unreasonable risk of causing emotional distress . . . that . . . if it were caused, might result in illness or bodily harm. Nevertheless, for the following reasons, we conclude that, when the employment relationship is ongoing, the public policies enumerated in *Jaworski v. Kiernan,* [241 Conn. 399, 407 (1997)],outweigh the interests of persons subject to such behavior in the workplace in being compensated for their emotional injuries.

*Perodeau v. City of Hartford*, 259 Conn. 729, 757–58 (2002) (citations and internal quotation marks omitted). Thus, "actions or omissions occurring within the context of a continuing employment relationship, as distinguished from actions or omissions occurring in the termination of employment," generally cannot satisfy the first element of a claim for negligent infliction of emotional distress. *Id.* at 744.

"[N]egligent infliction of emotional distress in the employment context arises only where it is 'based upon unreasonable conduct of the defendant in the termination process.'" *Parsons v. United Techs. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88 (1997) (quoting *Morris v. Hartford Courant Co.*, 200 Conn. 676, 682 (1986)). "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Id.* at 88–89. "Instead, 'the employer's conduct must be humiliating,

extreme, or outrageous."[3] *Tomby v. Cmty. Renewal Team, Inc.*, No. 3:09-cv-1596 (CFD), 2010 WL 5174404, at *4 (D. Conn. Dec. 15, 2010) (quoting *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 197 (D. Conn. 2000)).

Inline argues that Mr. Kleftogiannis fails to state a claim for negligent infliction of emotional distress because (1) none of the conduct alleged in the context of his termination was extreme or outrageous; and (2) the remainder of the conduct he alleges caused his distress was within the context of a continuing employment relationship and was not extreme or outrageous.

The Court agrees.

Mr. Kleftogiannis attempts to overcome the motion by arguing that all of the conduct beginning with his demotion in June 2017 and his termination in September 2017 was "part of" the termination process. Pl.'s Mem. at 7. He particularly argues that being subject to a "sham discriminatory investigation based on his age" was extreme and outrageous. *Id.*

The demotion, however, was a separate employment action from the termination—even if the Court were to accept Mr. Kleftogiannis's view that they were related. As the Connecticut Supreme Court recognized, such demotions fall squarely within the category of routine employment-related conduct, as do investigations. *See Perodeau*, 259 Conn. at 757–58.

In addition, numerous courts have recognized that "[e]ven if a plaintiff is terminated as a result of findings that that result from an investigation, the investigation itself is generally not part of the termination process." *Dickinson*, 431 F. Supp. 2d at 261 (collecting cases).

---

[3] *See also Parsons*, 243 Conn. at 89 ("As the trial court observed in granting the defendant's motion to strike, 'the defendant was not required to suffer a waiting period in excess of two hours before terminating the plaintiff's employment [because] the plaintiff was an at-will employee [and thus] his employment could be terminated at any time.' Moreover, it is not patently unreasonable for an employer to remove a discharged employee from its premises under a security escort.") (citations omitted); *id.* at 98 (Berdon, J., dissenting) (disagreeing with majority's view that defendant's allegation—that he was immediately terminated for refusing to perform a dangerous, possibly fatal, work assignment, by traveling to Bahrain in immediate wake of Iraq's invasion of Kuwait and travel warning against travel from State Department—was insufficiently extreme or outrageous to state a claim for negligent infliction of emotional distress).

Courts within this District typically resolve questions regarding negligent infliction of emotional distress at the motion to dismiss stage, given the very limited circumstances under which the Connecticut Supreme Court has permitted such claims to proceed. *See, e.g.*, *Pecoraro v. New Haven Register*, 344 F. Supp. 2d 840, 847 (D. Conn. 2004) ("No facts are alleged concerning events that occurred during the resignation process or once plaintiff terminated her employment. Even if the Court considered the events transpiring shortly before she resigned, her only allegation is that defendant's Human Resources officer did not want to hear the tape of the harassing phone call her daughter received and accused plaintiff of making the phone call herself, rather than one of her coworkers. In so doing, he mimicked her in an offensive manner. While this alleged conduct is tasteless, insensitive, and highly inappropriate for someone in the human resources field, it does not rise to the level of conduct that is sufficiently wrongful that defendant should have realized that it involved an unreasonable risk of emotional distress. Accordingly, the Court grants defendant's motion to dismiss count eleven of plaintiff's amended complaint.") (citation omitted); *Jaggon v. Cmty. Health Servs. Inc.*, No. 3:18-cv-458 (JCH), 2018 WL 6201707, at *4 (D. Conn. Nov. 28, 2018) ("Jaggon has not alleged any unreasonable conduct on the part of CHS in the termination process. Indeed, his only allegations regarding termination are conclusory. Therefore, the Motion to Dismiss Count Four is granted.") (citation omitted).

Accordingly, the Court finds that Count Four must be dismissed.

## C. Leave to Amend

While Mr. Kleftogiannis has not yet moved for leave to amend the Complaint, for the reasons discussed below, granting such leave to amend also would be futile.

"[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint." *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003) (citing *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)). "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Koehler v. Bank of Bermuda (N.Y.) Ltd.*, 209 F.3d 130, 138 (2d Cir. 2000)).

Where there is no indication that pleading additional facts would resuscitate a claim that has been dismissed, the Court need not grant leave to amend. *See Gruillon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) ("Leave to amend may properly be denied if the amendment would be 'futil[e].'") (quoting *Foman*, 371 U.S. at 182); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("[w]here it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) ("[W]e do not find that the complaint 'liberally read' suggests that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe . . . . The problem with [this pro se plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citations, internal quotation marks, and alterations omitted).

Leave to amend here would be futile because, as outlined above, the legal theory behind Mr. Kleftogiannis's negligent infliction of emotional distress claim is fundamentally flawed in light of Connecticut's high standard for proving "extreme and outrageous conduct" in the

employment context sufficient to sustain a claim of negligent infliction of emotional distress. An opportunity to amend will not cure this claim. *See, e.g.*, *Glover v. State Univ. of N.Y. at Buffalo*, No. 08CV418, 2009 WL 857514, at *3 (W.D.N.Y. Mar. 27, 2009) ("Plaintiff's amendment here would be futile given the Eleventh Amendment immunity enjoyed by defendant. In addition, this proposed amendment does not address the fatal flaw in plaintiff's Complaint, the immunity enjoyed by defendant under the Eleventh Amendment. Plaintiff fails to cure this significant deficiency by this amendment, if any amendment can obviate the Eleventh Amendment immunity plaintiff faces in commencing this action against SUNY.").

Accordingly, the Court declines to provide leave to amend the Complaint's allegations with respect to this claim.

### D. Redaction of the Complaint

As the Second Circuit recently re-affirmed in *Brown v. Maxwell*, 929 F.3d 41 (2d Cir. 2019), "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." *Brown*, 929 F.3d at 49 (quoting *Amodeo I*, 44 F.3d at 145). "Instead, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *Id.* (quoting *Amodeo I*, 44 F.3d at 145).

A document is ""relevant to the performance of a judicial function' if it would reasonably have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." *Id.* (citing *Amodeo I*, 44 F.3d 145– 46; *FTC. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 409 (1st Cir. 1987)). "[I]f in applying

these standards, a court determines that documents filed by a party are *not* relevant to the performance of a judicial function, no presumption of public access attaches." *Id.*

"Once an item is deemed relevant to the exercise of judicial power, 'the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" *Id.* (quoting *United States v. Amodeo* (*Amodeo II*), 71 F.3d 1044, 1049 (2d Cir. 1995)). "[D]ocuments that 'play only a negligible role in the performance of Article III duties' are accorded only a low presumption that 'amounts to little more than a prediction of public access absent a countervailing reason.'" *Id.* at 49–50 (quoting *Amodeo II*, 71 F.3d at 1050.

Inline argues that the names of the non-management employees who participated in the investigation were only disclosed during a confidential fact finding conference held by an attorney investigator of the Connecticut Commission of Human Rights and Opportunities (CHRO), that it has an interest in keeping the names of employees who participate in its internal investigations confidential, and that those employees also have a privacy interest in keeping their names and involvement in an internal investigation confidential. *See* Def.'s Redaction Mem. at 2–6.

Mr. Kleftogiannis opposes the motion and argues that "given the presumption of openness of court proceedings, the Defendant's Motion to Seal should be denied as there are not sufficient privacy interests at stake to justify the drastic measure of redacting parts of the complaint." Pl.'s Redaction Mem. at 4. He argues that that granting Defendant's motion will impede his "right to discover information to support his claims." *Id.* at 5–6.

The Court disagrees.

The Complaint is undoubtedly a document "relevant to the performance of a judicial function" to which a strong presumption of public access attaches. *See Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 140 (2d Cir. 2016) ("[P]leadings are considered judicial records even when the case is pending before judgment or resolved by settlement . . . . Pleadings, such as the complaint here, are highly relevant to the exercise of Article III judicial power. Of all the records that may come before a judge, a complaint is among the most likely to affect judicial proceedings. It is the complaint that invokes the powers of the court, states the causes of action, and prays for relief . . . . ") (citations and internal quotation marks omitted).

But that does not mean that every word in the Complaint enjoys an inviolable presumption of public access. *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982) ("We do not say that every piece of evidence, no matter how tangentially related to the issue or how damaging to a party disclosure might be, must invariably be subject to public scrutiny. An exercise of judgment is in order. The importance of the material to the adjudication, the damage disclosure might cause, and the public interest in such materials should be taken into account before a seal is imposed."). The presumption of public access can be overcome, if the proponent of sealing demonstrates "that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Bernstein*, 814 F.3d at 144 (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

As the Second Circuit further recognized in *Brown*, district courts have "supervisory power" over their own records and files. *Brown*, 929 F.3d at 51. Examples of that supervisory power noted by the Second Circuit include the use of protective orders, placing filings under

seal, and striking material "deemed redundant, immaterial, impertinent, or scandalous" under Federal Rule of Civil Procedure 12(f). *Id.* (citations omitted).

That supervisory power is routinely used to redact or otherwise restrict access to sensitive personally identifying information contained in court documents, including complaints. *See, e.g.*, *B. v. City of N.Y.*, No. 14-CV-1021 (KAM)(PK), 2016 WL 4530455, at *5 n.4 ("The court also notes that the opposition brief violates Fed. R. Civ. P. 5.2(a)(3) by providing the full name of the minor S.B., which also repeatedly appears unredacted in R. Livingston and S.B.'s complaint as well as in the declaration annexed to plaintiffs' opposition brief. The Clerk of Court has therefore been directed to restrict access to the court and counsel for the following submissions: (1) R. Livingston's opposition brief; (2) the declaration annexed to the opposition brief; and (3) R. Livingston and S.B.'s complaint.") (citation omitted); *see also* Fed. R. Civ. P. 5.2(a). Indeed, that supervisory power is used to allow a plaintiff to proceed anonymously, under a pseudonym, where there is a substantial privacy interest that outweighs the prejudice to the defendant and the public interest in disclosure. *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189–90 (2d Cir. 2008) (discussing factors courts should weigh in such circumstances).

Indeed, at least one court has exercised this supervisory power to strike names of potential non-party witnesses in a complaint as immaterial. *See In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 337 (D. Conn. 2004) ("[T]he Court notes that the defendants in [one case within this multi-district litigation] moved to strike from the Government's complaint the names of physicians who were personally informed that the Government might not pay for some of the procedures at issue because they were experimental. The defendants argued that the names of the physicians were immaterial. The Court granted the motion to strike."). Courts have similarly exercised this power when ordering redactions of names from warrants, warrant applications, and

supporting affidavits. *See United States v. Cohen*, 366 F. Supp. 3d 612, 625 (S.D.N.Y. 2019) ("Here, the parties involved with business transactions relating to Cohen's taxi medallions seem to be 'peripheral characters' for whom the Materials raise little discernable inference of criminal conduct. The relevant considerations weigh in favor of redacting the names and descriptions of these uncharged individuals, who may nonetheless be 'stigmatized from sensationalized and potentially out-of-context insinuations of wrongdoing, combined with the inability of these third parties to clear their names at trial.' For the same reasons, references to those around Cohen from which the public might infer criminal complicity—as opposed to references to individuals or entities mentioned only in passing—should also be redacted.") (quoting *Amodeo II*, 71 F.3d at 1051 n.1, and *United States v. Smith*, 985 F. Supp. 2d 506, 526 (S.D.N.Y. 2013), and citing *United States v. Huntley*, 943 F. Supp. 2d 383, 388 (E.D.N.Y. 2013)).

Here, Inline has a significant and weighty interest, as an employer charged with in ensuring that its employees do not fear reprisal or retaliation from current or former co-workers as a result of their participation in internal investigations, and that those employees have significant privacy interests of their own as well. *See S.E.C. v. TheStreet.Com*, 273 F.3d 222, 232 (2d Cir. 2001) ("[T]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation.") (quoting *Amodeo II*, 71 F.3d at 1050). As Inline points out: " "Employees are less likely to be cooperative and forthcoming when speaking with a representative of human resources if their involvement in an investigation becomes publicly available . . . . The naming of all of the individuals serves merely to harass and embarrass defendant's employees, to frustrate future human resources investigations, and to needlessly increase the hostility between the parties in this litigation." Redaction Mem. at 6.

Inline's proposed solution—redaction of non-party, non-management employees' names—is narrowly tailored to serve those interests. *See United States v. Milken*, 780 F. Supp. 123, 127 (S.D.N.Y. 1991) (discussing need for parties to ensure redactions are narrowly tailored to protect public's right to information while protecting countervailing interests against disclosure).

The Court also finds no risk of prejudice to Plaintiff from redacting those names from the Complaint. Those names will still be part of the underlying Complaint, but will simply be redacted from the public version of the Complaint. These redactions will not prevent Plaintiff from deposing those witnesses in any way, or from pursuing other relevant discovery to support his remaining claims of age discrimination (under the ADEA and the CFEPA) and for defamation. Nor will the redactions impede the public's right of access to the underlying claims at issue in this case.

The Court therefore concludes that redaction of the names from the Complaint "strikes an appropriate balance between the strong presumption of public access" that attaches to the Complaint "and the countervailing interests identified" by Inline. *Cohen*, 366 F. Supp. 3d at 623.

## IV.     CONCLUSION

For the reasons explained above, Inline's motion to dismiss is **GRANTED IN PART AND DENIED IN PART.** The motion to dismiss is denied with respect to Plaintiff's claim of defamation (Count Three), but granted with respect to Plaintiff's claim of negligent infliction of emotional distress (Count Four).

Inline's motion to redact non-party names in the Complaint is **GRANTED.**

The Clerk of the Court is respectfully directed to replace the current version of the Complaint with the version submitted by Inline, currently annexed as Exhibit A to Defendant's

motion to seal/redact, ECF No. 11-1, at 10–18, and to docket separately the unredacted

Complaint as a sealed document.

      **SO ORDERED** at Bridgeport, Connecticut, this 6th day of September, 2019.

                                          /s/ Victor A. Bolden
                                        Victor A. Bolden
                                        United States District Judge